# Exhibit D

1   SHANNON LISS-RIORDAN (SBN 310719)
    (sliss@llrlaw.com)
2   ANNE KRAMER (SBN 315131)
    (akramer@llrlaw.com)
3   LICHTEN & LISS-RIORDAN, P.C.
    729 Boylston Street, Suite 2000
4   Boston, MA 02116
    Telephone:     (617) 994-5800
5   Facsimile:     (617) 994-5801
6
7   *Attorneys for Plaintiff John Rogers,*
    *on behalf of himself and all others similarly situated*
8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  FOR THE COUNTY OF SAN FRANCISCO

11

12                                          Case No. CGC-20-583685
13  JOHN ROGERS, on behalf of himself and all
    others similarly situated,
14
                                            **PLAINTIFF'S NOTICE OF AND**
15                    Plaintiff,            **MEMORANDUM IN SUPPORT OF HIS**
                                            ***EX PARTE* APPLICATION FOR AN**
16           v.                             **EMERGENCY PRELIMINARY**
                                            **INJUNCTION**
17  LYFT, INC.,

18                    Defendant             Hearing Date: March 19, 2020
19                                          Hearing Time:  8:30 a.m.

20                                          Complaint Filed: March 12, 2020
21                                          Trial Date: None Set
22

23

24

25

26

27

28

          PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
                  APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

## NOTICE OF EX PARTE APPLICATION

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 19, 2020, at 8:30 a.m. in the San Francisco Superior Court, 400 McAllister St., San Francisco, CA 94102. Plaintiff John Rogers will and herby do apply *ex* parte, pursuant to Rules of Court 3.1200 *et seq*., for an emergency preliminary injunction enjoining Defendant Lyft, Inc. from misclassifying Plaintiff and all others similarly situated, namely all other individuals working as Lyft drivers in California, as independent contractors and thereby denying these workers their rights under the Labor Code, including state-mandated paid sick leave in violation of Cal. Lab. Code § 246.

Counsel for Plaintiff provided written notice of this *ex parte* application in accordance with California Rule of Court 3.1203 on March 17, 2020, by email to Defendants' counsel.[1] Declaration of Shannon Liss-Riordan ("Liss-Riordan Decl.) ¶ 8. The *ex parte* notice was timely and included all of the information required by Rule of Court 3.1204. Id.  Defendant's counsel replied at noon on March 17, 2020, stating that it would oppose the application. Id.; see also Ex. 4 to Liss-Riordan Decl. Pursuant to California Rule of Court 3.1202(a), and to Rules of Court 3.300(d), the names, addresses, telephone number, and email addresses for the attorneys representing the other parties in the matter, see note 1, are:

> KEKER, VAN NEST & PETERS LLP
> R. JAMES SLAUGHTER, SBN 192813
> rslaughter@keker.com
> JO W. GOLUB, SBN 246224
> jgolub@keker.com
> ERIN E. MEYER, SBN 274244
> emeyer@keker.com
> MORGAN E. SHARMA, SBN 313863
> msharma@keker.com

---

[1]     As the underlying complaint is in the process of being served, Plaintiff's counsel provided notice to counsel that has represented Defendant Lyft, Inc. in other similar matters, including the case Seifu v. Lyft, Inc. (Cal. Super. Ct.) Case No., BC712959.

i

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415.391.5400
Facsimile:      415.397.7188

Plaintiff's *ex parte* application is based on this notice, the attached memorandum of points and authorities, the Declaration of Shannon Liss-Riordan in support thereof and accompanying exhibits, and any further evidence or argument that the Court receives prior to the decision.


Dated: March 17, 2020                          Respectfully submitted,

JOHN ROGERS, individually and on behalf of all others similarly situated,

By his attorney,

_____ */s/ Shannon Liss-Riordan*_____
Shannon Liss-Riordan (SBN 310719)
LICHTEN & LISS-RIORDAN, P.C.

ii

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

1

2

**Table of Contents**

3

I. Introduction .................................................................................................................. 1

4

II. Factual And Procedural Background ........................................................................ 6

5

III. Argument .................................................................................................................. 8

6

  A.  The Court Should Grant Plaintiff's Motion For A Preliminary Injunction ........................ 8

7

     i.   Standard Of Review ................................................................................................ 8

8

     ii.  Plaintiff Is Likely To Prevail On The Merits ............................................................ 9

     iii. Lyft Drivers, As Well As The Public, Will Suffer Interim Harm Greater Than
        That Of Lyft Should A Preliminary Injunction Not Issue ......................................... 11

9

IV. Conclusion ............................................................................................................... 15

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

**Table of Authorities**

**Cases**

Carey v. Gatehouse Media Massachusetts I, Inc.
    (Mass. App. Ct. 2018) 92 Mass. App. Ct. 801 ....................................................... 13

City of Corona v. AMG Outdoor Advertising, Inc.
    (2016) 244 Cal. App. 4th 291 ............................................................................... 11

Common Cause v. Board of Supervisors
    (1989) 49 Cal.3d 432 ............................................................................................ 12

Cotter v. Lyft
    (N.D. Cal. 2015) 60 F.Supp.3d 1067 ............................................................... 8, 13

Dynamex Operations W., Inc. v. Superior Court
    (2018) 4 Cal. 5th 903 ..................................................................................... passim

Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc.
    (2016) 6 Cal. App. 5th 1178 ................................................................................. 11

Johnson v. VCG-IS, LLC
    (Cal. Sup. Ct. Aug. 30, 2018) Case No. 30-2015-00802813-CU-CR-CXC .......... 14

King v. Meese
    (1987) 43 Cal. 3d 1217 ..................................................................................... 8, 12

Massachusetts Delivery Ass'n. v. Coakley
    (1st. Cir. Sept. 30, 2014) 2014 WL 4824976 ........................................................ 13

McGill v. Citibank, N.A.
    (2017) 2 Cal.5th 945 ............................................................................................... 8

Nieto v. Fresno Beverage Co., Inc
    (2019) 33 Cal. App. 5th 274 .................................................................................... 9

O'Connell v. Superior Court
    (2006) 141 Cal. App. 4th 1452 .............................................................................. 15

O'Connor v. Uber Technologies, Inc.
    (N.D. Cal. 2015) 82 F. Supp. 3d 1133 .................................................................. 13

O'Connor v. Uber Technologies, Inc.,
    82 F. Supp. 3d 1133 (N.D. Cal. 2015) ..................................................................... 8

Oliveira v Advanced Delivery Sys., Inc.
    (Mass. Super Jul. 16, 2010) 2010 WL 4072360 ................................................... 13

People of the State of California v. Maplebear, Inc.
    (Cal. Sup. Ct. Feb. 18, 2020) Case No. 2019-48731 ...................................... passim

ii

Right Site Coalition v. Lose Angeles Unified School Dist.
    (2008) 160 Cal. App. 4th 336 ........................................................................ 7, 12

Rittman v. Amazon
    (W.D. Wash. 2019) 383 F. Supp. 3d 1196 ................................................................. 9

Schwann et al v. FedEx Ground Package Sys., Inc.
    (D. Mass. July 3, 2013)  2013 WL 3353776 .......................................................... 13

Singh v. Uber Techs.
    (3rd Cir., Sept. 11, 2019) 2019 WL 4282185 ........................................................... 9

Waithaka v. Amazon
    (D. Mass., Aug. 20, 2019) 2019 WL 3938053 ........................................................ 9


**Statutes**

2014 California Assembly Bill No. 1522
    California 2013–2014 Regular Session, § 1(e) ................................................ 13, 15

2019 California Assembly Bill No. 5
    California 2019–2020 Regular Session § 1(e) ......................................................... 13

Assembly Bill No. 5 ("AB 5") .................................................................... 3, 6, 7, 8

Cal. Lab. Code § 246 ........................................................................... passim

Cal. Lab. Code § 2750.3 ...................................................................... 3, 5, 9

Federal Arbitration Act ("FAA")
    9 U.S.C. § 1 ......................................................................................... 5

iii

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS**
***EX PARTE* APPLICATION FOR EMERGENCY INJUNCTIVE RELIEF**

## I.     INTRODUCTION

Pursuant to California Rule of Court 3.300, Plaintiff John Rogers brings this motion to seek an emergency preliminary injunction against Defendant Lyft, Inc. ("Lyft") for misclassifying its drivers as independent contractors when they are actually employees under California law.  Because of this misclassification, Lyft is in particular violating Cal. Lab. Code § 246 by failing to provide the drivers with paid sick leave – which will exacerbate the global health crisis we are now facing and requires immediate emergency redress.

This crisis starkly demonstrates the harm that Lyft's misclassification of its drivers is causing, not only to Lyft drivers but also the general public, as drivers are deprived of an important workplace protection to which they are entitled as employees.  Lyft's failure to provide paid sick leave means Lyft drivers will need to work while sick to make ends meet and substantially increases the likelihood Lyft drivers will spread illnesses to the general public.  The severity of this risk has substantially increased as the international community faces the rapid spread of COVID-19 (the "coronavirus"), which the World Health Organization has classified as a pandemic and has compelled California to declare a state of emergency.  Declaration of Shannon Liss-Riordan (Liss-Riordan Decl.), ¶ 8.  Yesterday, San Francisco issued a mandate to its residents to shelter-in-place – with an exception made for "gig economy" workers, including Lyft drivers. Id. ¶10.[2]  However, although these workers are on the front lines of this crisis (driving residents where they need to go for essential services and allowing them to avoid public transportation), they are not even receiving the benefits of California's state-mandated labor

---

[2]     Government mandates are rapidly changing in response to the crisis, and these orders are as of this writing.  In recognition of the threat to public health as a result of employers denying paid sick leave during this pandemic, Congress has been developing emergency legislation that attempts to address the issue. The House of Representatives passed a bill Saturday providing two weeks of paid sick leave to some workers.  However, the bill would exclude Lyft drivers who are not recognized as employees. Liss-Riordan Decl. ¶ 2 13.  The state of emergency and uncertainty only further confirm the need for enforcement of those state law protections already in place.

1

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

protections because of their misclassification as independent contractors.  The dire consequences of Lyft's decision to continue to misclassify its drivers as independent contractors (in defiance of clear law) are now being borne out, as Lyft drivers who are compelled to continue working because Lyft does not provide them state-mandated paid sick leave could now become "vectors" for spreading the coronavirus. Liss Riordan Decl. ¶ 23.

Lyft's failure to provide state-mandated paid sick now means that Lyft drivers will need to work while sick to make ends meet and substantially increases the risk that Lyft drivers will spread illnesses to the general public.  In the words of one Lyft driver:

> I can't self-quarantine because not working is not an option. If I don't make enough money, I can't feed my children for the next six weeks. I'm not stopping, fever or no fever. And that's what most other gig workers would do too, because none of us makes enough money to save up for an emergency like this.

Id. ¶ 15.  This driver is not alone.  Gig Workers Rising recently sent a letter to Governor Gavin Newsom and other state officials, asserting that "Lyft. . . and other gig economy companies are putting drivers and passengers at risk during coronavirus," by refusing to classify Lyft drivers as employees and provide them with basic employee protections. Id. ¶ 16.  In support, one worker confirmed: "Sickness is not an option for me because not working is not an option. If I do get sick, I will have to continue to work. . ." Id.

Lyft drivers may drive **dozens** of passengers (including those who have been ordered to self-quarantine) each day – and are clearly not able to maintain the six foot distance recommended by experts to prevent the rapid spread of COVID-19 (the "coronavirus"). Id. ¶ 17.  Thus, in the face of this global crisis, there appears a resounding consensus: "Companies that do not pay sick workers to stay home are endangering their workers, their customers and the health of the broader public." Id. ¶ 17.  California already has on the books a paid sick leave law, and the only thing standing in the way of Lyft drivers receiving this critical benefit is Lyft's refusal to acknowledge that its drivers are employees under California law.[3]

---

[3]     Lyft has stated that it plans to provide (an undefined amount of) compensation to drivers

2

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

Since the California Supreme Court's decision in <u>Dynamex Operations W., Inc. v.</u> <u>Superior Court</u> (2018) 4 Cal. 5th 903, 956–57 ("<u>Dynamex</u>"), which adopted a stringent "ABC" test, whereby an alleged employer must prove <u>all</u> three prongs of the test in order to justify independent contractor status, including that workers "performs work that is outside the usual course of the hiring entity's business," <u>id.</u> at 957, Lyft has faced an uphill (and insurmountable) battle in justifying its classification of drivers as independent contractors. Assembly Bill No. 5 ("AB 5") codified <u>Dynamex</u>, <u>see</u> Cal. Lab. Code § 2750.3 (effective Jan. 1, 2020).  The California legislature and public have broadly understood that AB 5 requires "gig economy" companies such as Lyft to classify their drivers as employees and provide them state-mandated employment protections. Liss-Riordan Decl. <u>Id.</u> ¶ 25.  The bill has even been dubbed the "gig labor bill" and described as "dealing a potential body blow to gig economy players, **like** Uber and **Lyft**." <u>Id.</u> ¶ 26.  As the preamble to the legislation makes clear, the "ABC" test is meant to "ensure workers who are currently exploited by being misclassified" gain access to "the basic rights and protections they deserve under the law, including a minimum wage, workers' compensation . . . unemployment insurance, *paid sick leave*, and paid family leave."  A.B. 5 § 1(e) (emphasis added).  Arguments that Lyft drivers are independent contractors not legally entitled to paid sick leave are sure to fail under <u>Dynamex</u> and A.B. 5.  Yet, despite the clear message of the state's highest court, its legislature, and the Governor (who signed A.B. 5 into law), Lyft has continued to refuse to acknowledge that its drivers are employees and is now contributing to the global health crisis by denying them state-mandated paid sick leave.

Lyft clearly is aware that its drivers must now be classified as employees and receive the protections of the Labor Code, as it has announced that it, along with two other "gig economy" companies, intends to invest $30 million ($90 million total) for a ballot initiative to overturn or

---

who are diagnosed with coronavirus. <u>See</u> <u>Id.</u> ¶ 24.  However, California's paid sick leave statute does not require a diagnosis (nor does it allow doctor's note requirement to thwart an employee taking advantage of accrued sick leave); Lyft's new voluntary policy therefore falls short of the requirements of California law.

3

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

exempt itself from the "ABC" test in A.B. 5. Liss-Riordan Decl. ¶ 27.  If Lyft can afford to pour these resources into a campaign against the "ABC" test, it can afford to provide its drivers with employment protections, including paying its drivers sick leave as required by California law.

That Lyft's misclassification of its drivers warrants immediate relief is made clear by the recent preliminary injunction issued by Judge Taylor of the California Superior Court for the County of San Diego (issued even before the current crisis of the coronavirus pandemic).  Judge Taylor ordered the gig economy company Instacart to stop misclassifying its workers ("Shoppers") as independent contractors.  See People of the State of California v. Maplebear, Inc., (Cal. Sup. Ct. Feb. 18, 2020) Case No. 2019-48731, at *4 (Ex. 3 to Liss-Riordan Decl.).  In evaluating the preliminary injunction motion, Judge Taylor found that "is it more likely than not that the People will establish at trial that the 'Shoppers' perform a core function of defendant's business" (Prong B) and found that (more likely than not) the People would prevail on the other two prongs (Prongs A and C) of the "ABC" test. Id.  Further, Judge Taylor both heard and adjudicated the preliminary injunction motion on an *ex parte* basis, _before_ ruling on Instacart's pending motion to compel arbitration of the claims. Id. at *2 (noting hearing on defendant's motion to compel arbitration set for "two weeks hence").

Here too, Plaintiff can establish a likelihood of prevailing on the merits – as well as a likelihood of overcoming Lyft's anticipated attempt to shield itself from a ruling by this court through use of its arbitration agreement.  Significantly, the Court need not make a final decision on any issue at this juncture; all that is before the Court now, in analyzing this motion for preliminary injunction, which should be decided quickly under these exigent circumstances, is whether Plaintiff has a _likelihood_ of prevailing.  In deciding whether to issue an injunction, California courts must weigh "'two interrelated factors,' specifically, the _likelihood_ that plaintiff will prevail on the merits at trial, and the comparative harm to be suffered by plaintiffs if the injunction does not issue against the harm to be suffered by defendants . . . if it does." Right Site Coalition v. Lose Angeles Unified School Dist. (2008) 160 Cal. App. 4th 336, 338 (citing King

4

v. Meese (1987) 43 Cal. 3d 1217, 1226) (emphasis supplied).  Both factors support an injunction.

**First**, it is clear that Plaintiff is likely to prevail on the merits of his misclassification claim.  Under the conjunctive, three-pronged "ABC" test announced in Dynamex and enacted in A.B. 5, a putative employer bears the burden of satisfying each prong in order to justify classifying workers as independent contractors.  See generally Cal. Lab. Code § 2750.3(a)(1) (codifying the "ABC" test).  Here, Lyft cannot satisfy Prong B, which requires an alleged employer to prove that the worker performs services outside its usual course of business.  Id. While Lyft may attempt to argue that it is merely a technology company, Lyft cannot avoid the inevitable conclusion that it is a transportation company and that it depends upon its drivers to sustain and carry out its transportation business.  See Cotter v. Lyft, (N.D. Cal. 2015) 60 F.Supp.3d 1067, 1069 ("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is not a serious one"); see also O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1144 (N.D. Cal. 2015) ("[I]t strains credulity to argue that Uber is not a 'transportation company' or otherwise is not in the transportation business.").  Thus, Lyft will likely fail to satisfy its burden under Prong B, and Plaintiff will thus prevail in proving that Lyft, as a consequence, has violated the California paid sick leave law, since Lyft does not even acknowledge its drivers to be employees entitled to the benefit of Cal. Lab. Code § 246.

Lyft will argue that this Court cannot reach this issue because it will attempt to enforce its arbitration provision, thus preventing Plaintiff from pursuing his claim in this Court.  However, the Court should reject this argument on a preliminary injunction basis, since Plaintiff has a likelihood of prevailing in defeating Lyft's anticipated motion to compel arbitration in this case for two reasons.  First, Plaintiff is seeking public injunctive relief, which the California Supreme Court has held cannot be thwarted through use of an arbitration clause.  See McGill v. Citibank, N.A. (2017) 2 Cal.5th 945, 962.  Second, Plaintiff intends to show that Lyft drivers are exempt from the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, as they fall within the transportation worker exemption to the Act.  See Nieto v. Fresno Beverage Co., Inc. (2019) 33 Cal. App. 5th

5

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

274, 276-77; <u>Singh v. Uber Techs.</u>, (3rd Cir., Sept. 11, 2019) 2019 WL 4282185.[4]

**Second**, as to the balancing of harms, there can be no serious argument that helping prevent the spread of a global pandemic is outweighed by the cost to Lyft of coming into compliance with <u>Dynamex</u>, A.B. 5, and Cal. Lab. Code § 246 (which the company will have to inevitably do, whenever the pending misclassification claims are adjudicated).  Lyft has simply ignored the pronouncement of the California Supreme Court for nearly two years since the <u>Dynamex</u> decision was issued, and the consequences are being wrought in dire form.

For the foregoing reasons, and as set forth further below, this Court should order the requested *ex parte* relief and issue an emergency preliminary injunction enjoining Lyft from misclassifying its drivers, so that they will receive the protections of California law, including paid sick leave, so as to prevent irreparable, interim harm to Lyft drivers and the general public.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On March 11, 2020, Plaintiff brought this case on behalf of himself and other Lyft drivers throughout California, alleging that Lyft has misclassified its drivers as independent contractors, when in reality they are employees of Lyft and therefore entitled to employment protections under the California Labor Code, including paid sick leave.  <u>See</u> Complaint ¶ 2 (Ex. 1 to Liss-Riordan Decl.).  Plaintiff Rogers is an adult resident of North Hollywood, California, where he has worked as a Lyft driver since November 2014.  <u>Id</u>. ¶ 7 Lyft has misclassified Plaintiff and other Lyft drivers as independent contractors.  <u>Id</u>. ¶ 24.  Because Lyft drivers are in fact employees, they are entitled to paid sick days under Cal. Lab. Code § 246.  Lyft has violated this provision by, as a matter of policy, failing to provide paid sick days to its drivers as required by California law.  <u>Id</u>. ¶ 30.

---

[4]     <u>See also</u> <u>Rittman v. Amazon</u> (W.D. Wash. 2019) 383 F. Supp. 3d 1196, 1201-02 (Amazon delivery drivers fall under the § 1 transportation worker exemption, as they transport some goods that travel across state lines, even though the drivers themselves do not cross state lines); <u>Waithaka v. Amazon</u>, (D. Mass., Aug. 20, 2019) 2019 WL 3938053, at *2–4 (same).

6

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

In April 2018, the California Supreme Court issued a strong statement regarding the importance of proper classification of workers as employees and how critical it is to the State of California that workers receive protection under the Labor Code. Liss Riordan Decl. ¶ 3.  In <u>Dynamex Operations W., Inc. v. Superior Court</u>, (2018) 4 Cal.5th 903, 956–57, the California Supreme Court adopted an especially stringent "ABC" test for employee classification, making it very difficult for alleged employers to justify classifying workers as independent contractors. The California Supreme Court explained that the "ABC" test was necessary to further the remedial purpose of the state's wage protections, ensuring that workers performing services that comprise a company's core business are afforded basic rights in the workplace. <u>Id</u>. at 952.

Last fall, the California legislature passed A.B. 5, which went into effect in January and codifies the "ABC" test enunciated in <u>Dynamex</u>. Liss-Riordan Decl. ¶ 5.  The legislature and general public in California appear to have assumed that workers for "gig economy" companies such as Lyft would be employees under the "ABC" test.  <u>Id</u>. ¶¶ 25-26.   This assumption has been borne out by the courts, as a judge recently issued a preliminary injunction ordering Instacart to stop misclassifying its "Shoppers" as independent contractors, based on the court's finding it more likely than not that Instacart would fail to carry its burden under the "ABC" test. Ruling on Mot. For Preliminary Injunction, <u>Maplebear, Inc.</u>, Case No. 2019-48731, at *4 (Ex. 3 to Liss-Riordan Decl.).  Because of the difficulty, in particular, of Lyft proving Prong B of this test, there can be little doubt that Plaintiff is likely to succeed on the merits of his misclassification claim.

Thus, Plaintiff has a strong likelihood of success, but absent prompt court intervention, Lyft will continue to misclassify its drivers and deny them the basic workplace protections to which they are entitled as employees. The California Supreme Court's decision in <u>Dynamex</u> and the legislature determined that misclassification constitutes a significant public harm.  Now, in the midst of an unprecedented public health crisis, Lyft's noncompliance with <u>Dynamex</u>, AB 5, and California's paid sick time law poses an imminent and substantial risk to the health, not only

7

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

of Lyft's drivers, but the general public as well.  Here, Lyft drivers and the general public will suffer irreparable harm in the absence of a preliminary injunction.  This Court should therefore grant preliminary injunctive relief to enjoin Lyft from classifying Lyft drivers as "independent contractors", so that they may receive the benefits of California labor protections, including paid sick leave as required by Cal. Lab. Code. § 246.

**III.   ARGUMENT**
  **A.   The Court Should Grant Plaintiff's Motion for a Preliminary Injunction**
    **i. Standard of Review**

This Court has the authority to issue a preliminary injunction under California Code of Civil Procedure, Rule 527(a).  Preliminary injunctions are primarily designed to preserve the status quo but are by no means limited to that purpose; preliminary injunctions are also appropriate in cases that mandate an affirmative act and alter the status quo, in "extreme cases where the right thereto is clearly established." Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc. (2016) 6 Cal. App. 5th 1178, 1184–85 (quoting City of Corona v. AMG Outdoor Advertising, Inc. (2016) 244 Cal. App. 4th 291, 299).  This case is no usual case.  As demonstrated by the intense public debate surrounding the Dynamex decision and subsequent codification through AB 5—but continued obstinance of Lyft in the face of clear law—this case is an extreme case that compels a preliminary injunction.  In light of the COVID-19 outbreak and the state of emergency declared in California, Lyft's noncompliance with Dynamex and AB 5— particularly by denying Lyft drivers legally guaranteed paid sick time—poses a significant, imminent risk to Lyft employees and to the general public. Preliminary injunctions are designed exactly for this situation, where judicial intervention and a court order is required to compel an affirmative act based on the high likelihood of plaintiff's success on the merits and to prevent public harm, as discussed below.

To determine whether a preliminary injunction should issue, the Court must weigh two factors: (1) the likelihood that Plaintiff will prevail on the merits at trial; and (2) the comparable

8

harm that Plaintiff will suffer in the absence of an injunction, with that of the harm suffered by Defendant should an injunction issue. <u>Right Site Coalition v. Lose Angeles Unified School Dist.</u> (2008) 160 Cal. App. 4th 336, 338 (citing <u>King v. Meese</u> (1987) 43 Cal. 3d 1217, 1226)). Notably, "the more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue." <u>Id.</u> at 338–39.[5]  As set forth below, because Plaintiff both has a strong success of likelihood on the merits and there will be irreparable harm suffered by the Plaintiff and the public if an injunction does not issue, Plaintiff has made a sufficient showing for the issuance of a preliminary injunction.

### ii.   Plaintiff is Likely to Prevail on the Merits

Under the stringent "ABC test" adopted in <u>Dynamex</u> and codified in AB 5, workers are presumed to be employees. <u>Dynamex</u>, 4 Cal.5th at 956-57.  The putative employer bears the burden of proving the conjunctive, three-prong test that: "(A) the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." <u>Id.</u> at 956-57; Cal. Lab. Code § 2750.3.  Lyft cannot meet this difficult standard.

Specifically, Lyft drivers perform services in the usual course of Lyft's business— providing transportation services—and thus Lyft cannot meet prong "B" of the "ABC test." Multiple courts have concluded that drivers and couriers perform services in the "usual course of business" under Prong B of the "ABC" test, even when their employers claim they merely "arrange" rides or deliveries, or try to claim that they are in the "technology" business, rather

---

[5]     When such a strong showing of success has been made, the trial court has discretion to issue the injunction, notwithstanding a plaintiff's inability to show that the balance of harms tips in his favor. <u>Right Site Coalition</u>, 160 Cal. 4th at 342 (quoting <u>Common Cause v. Board of Supervisors</u> (1989) 49 Cal.3d 432, 447).

9

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

than the "transportation" industry.  Cotter v. Lyft, (N.D. Cal. 2015) 60 F.Supp.3d 1067, 1069

("[T]he argument that Lyft is merely a platform, and that drivers perform no service for Lyft, is

not a serious one").  See also O'Connor v. Uber Technologies, Inc., (N.D. Cal. 2015) 82 F. Supp.

3d 1133, 1144 ("[I]t strains credulity to argue that Uber is not a 'transportation' company or

otherwise is not in the transportation business.").  Applying Massachusetts law, from which the

California Supreme Court adopted the "ABC" test, the First Circuit noted that "[t]here can be no

dispute that [couriers] act in the course of business for the delivery companies, even if one

performs the deliveries and the other arranges the deliveries."  Massachusetts Delivery Ass'n. v.

Coakley, (1st. Cir. Sept. 30, 2014) 2014 WL 4824976 at *7.[6]  Applying the "ABC" test now

under California law, Judge Taylor found that Instacart, a grocery delivery service (that similarly

describes itself as a technology platform), would be unable to carry its burden under Prong B (or

any prong of the test) of proving its Shoppers, who fulfill the grocery orders, are properly

classified as independent contractors:

> At this point is it more likely than not that the People will establish at trial that the
> "Shoppers" perform a core function of defendant's business; that they are not free from
> defendant's control; and that they are not engaged in an independently established trade,
> occupation or business. Establishing any one of these would be enough[.]

Ruling on Mot. For Preliminary Injunction, Maplebear, Inc., Case No. 2019-48731, at *4 (Ex. 3

to Liss-Riordan Decl.).  Likewise, the Superior Court of California for the County of Orange in

Johnson et al. v. VCG- IS, LLC, et al., following a litany of Massachusetts case law, granted

summary adjudication to plaintiff exotic dancers on the question of "employee status" under

---

[6]      See also Carey v. Gatehouse Media Massachusetts I, Inc., (Mass. App. Ct. 2018) 92
Mass. App. Ct. 801, 807, 813–14 (affirming grant of summary judgment to plaintiff delivery
drivers under Prong B); Schwann et al v. FedEx Ground Package Sys., Inc., (D. Mass. July 3,
2013)  2013 WL 3353776, *5 (rejecting defendant's attempt to characterize its business as
'logistics' rather than delivery services and noting, "[w]hether intended as shorthand for a more
metaphysical purveyor of logistics business entity or not, FedEx advertises that it offers package
pick-up and delivery services and its customers have no reason to believe otherwise"); Oliveira v
Advanced Delivery Sys., Inc., (Mass. Super Jul. 16, 2010) 2010 WL 4072360, *6-7 (rejecting
defendant employer's claim that it was in the business of outsourcing the home delivery of
furniture for retail furniture sellers rather than in the business of delivering furniture).

10

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

Prong B, based on minimal facts and common sense determinations regarding the defendant strip club's usual course of business and the services performed by the plaintiff dancers, despite the defendant's denial that it was in the adult entertainment business. <u>Johnson v. VCG-IS, LLC</u> (Cal. Sup. Ct. Aug. 30, 2018) Case No. 30-2015-00802813-CU-CR-CXC, at *4 (Ex. 2 to Liss-Riordan Decl.).  Here, the Court can similarly make a determination – which only requires at this point a preliminary determination of the <u>*likelihood*</u> of Plaintiff's prevailing on the merits of the misclassification claim – based on the facts before the Court now.

Because Lyft drivers are employees under the "ABC" test, Lyft drivers are entitled to paid sick leave days under Cal. Lab. Code § 246.  This provision requires employers to allow employees to accrue sick days at the rate of not less than one hour for every thirty hours worked after working for the employer for 30 days within a year from the start of their employment. Because Lyft does not even acknowledge its drivers to be employees, it does not pretend to be complying with the paid sick leave provision of Cal. Lab. Code § 246.[7]  Accordingly, Plaintiff has demonstrated a likelihood of success on the merits. Absent court intervention, however, Lyft drivers and the public will suffer interim harm greater than Lyft would suffer from having to comply with the law.

### iii.   Lyft Drivers, as well as the Public, Will Suffer Interim Harm Greater than that of Lyft Should a Preliminary Injunction Not Issue

The second factor the California courts consider in determining whether to issue a preliminary injunction is the relative interim harm to Plaintiff and Defendant if the injunction is

---

[7]      Lyft may attempt to argue that its policy issued on Wednesday, March 11, 2020, in light of the emergent crisis, somehow mitigates its violation of § 246. This argument must fail for at least two reasons:  **(1)** The policy does not comply with the statute as it requires a driver to obtain a COVID-19 diagnosis or be put under quarantine and merely states it will provide "funds" for drivers (rather than guaranteeing pay). COVID-19 tests are in notably short supply, such that receiving the official diagnosis or quarantine Lyft requires for this "benefit" is exceedingly unlikely. Liss-Riordan Decl. ¶24. **(2)** The policy does nothing to mitigate the public harm as public health recommendations advise anyone to stay home *as soon as* they begin feeling sick, and to maintain a six foot distance to prevent the spread of COVID-19, which Lyft drivers cannot do in close quarters with passengers.

11

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

(or is not) granted. <u>O'Connell v. Superior Court</u> (2006) 141 Cal. App. 4th 1452, 1463. Irreparable, potentially catastrophic harm to Lyft drivers and to the general public will result from Lyft and other companies' ongoing misclassification of their employees.  The WHO has confirmed that we are in the midst of a global pandemic. Liss-Riordan Decl. ¶ 8.  In California alone—as of this writing—there are 617 confirmed cases of COVID-19, with 11 confirmed deaths, while thousands of residents may have already been exposed to the disease. <u>Id</u>. ¶ 10. California has declared a state of emergency, and the State Department of Public Health is urging all to avoid close contact with people who are sick and to stay "away from work, school, or other people if you become sick with respiratory symptoms like fever and cough." <u>Id</u>. at ¶¶ 9, 11.  Just yesterday, San Francisco Mayor London Breed issued a shelter-in-place order. <u>Id</u>. ¶ 12. However, gig workers are excluded from the order, as San Francisco residents are still allowed to take Uber and Lyft rides for essential travel, <u>id</u>., demonstrating how Lyft drivers are providing essential transportation services to the city and highlighting how Lyft drivers who are sick are poised to become vectors of the disease.

Yet, by continuing to misclassify its drivers, Lyft is failing to provide them the basic workplace protections—to which they are legally entitled—which would enable them to comply with public health directives.  There can be no question that enforcing employee protections, already in place, would increase safety for both Lyft drivers and the general public.  Even in ordinary circumstances, Lyft's failure to provide its drivers these basic workplace protections unacceptably increases the likelihood that its drivers and passengers will get sick and spread illnesses.  In the current climate, denying workers these protections poses an intolerable risk to the health and safety of Lyft's employees, its customers, and the public at large.

The connection between public health and the availability of basic employment protections like paid sick days and leave policies is well established. <u>Id</u>. ¶ 19. A recent study found a that state-mandated access to paid sick leave policies reduced population-level flu infection rates by an average of eleven percent within the first year of the implementation of such

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

laws. <u>Id</u>. ¶ 20.  Unsurprisingly, low-wage workers are the most likely to lack these basic workplace protections, <u>id</u>. ¶ 22. Without the protections afforded by these and other workplace laws, workers like Lyft drivers are more likely to work while they are sick, increasing the likelihood they will transmit illnesses among the general public. <u>Id</u>.  Because they also lack the protection of other workplace protections like minimum wage and overtime laws, misclassified workers have no choice but to continue working while sick to make ends meet. <u>Id</u>.

Recognizing this connection between paid sick time policies and public health, California requires employers to provide their employees paid sick time. Cal. Lab. Code § 246.  When it passed its paid sick time policy, the Legislature recognized that "*<u>paid sick days will have an enormously positive impact on the public health of Californians by allowing sick workers paid time off to care for themselves . . . reducing the likelihood of spreading illness to other members of the workforce</u>*." 2014 California Assembly Bill No. 1522, California 2013–2014 Regular Session, § 1(e) (emphasis supplied).  And when it passed AB 5, the legislature made clear that it intended to ensure that misclassified workers gained access to these basic workplace protections. It noted that AB 5 would ensure that workers who are "currently exploited by being misclassified" would gain access to "the basic rights and protections they deserve under the law, including . . . *<u>paid sick leave</u>* and paid family leave."  2019 California Assembly Bill No. 5, California 2019–2020 Regular Session § 1(e) (emphasis added).  It is clear, then, that but-for Lyft's ongoing misclassification of its drivers in violation of AB 5, Lyft drivers would be granted this vital protection of paid sick leave.

In the context of a global pandemic, Lyft's ongoing refusal to provide basic workplace protections to its drivers poses an imminent, substantial risk of harm to its drivers and to the general public.  Faced with the choice of staying home without pay and risking losing access to housing, food, and other necessities of living, Lyft drivers across California will continue working and risk exposing hundreds of riders on a weekly basis to this deadly disease.

Lyft drivers may drive **dozens** of passengers each day – and are clearly not able to

13

maintain the six foot distance recommended by experts to prevent the rapid spread of COVID-19 (the "coronavirus"). Liss-Riordan Decl. ¶ 17.  Numerous health authorities, including the CDC, recognize that an essential component of mitigating the spread of such illnesses is the ability to self-quarantine and practice social distancing upon the onset of symptoms. Id. at ¶ 17.  Such protective measures are key to "flattening the curve" of the rate of infection so as to avoid overwhelming available health care resources. Id.  The availability of paid sick leave protections is essential to the success of such social distancing strategies.[8]  Even though they are the workers most likely to lack—or, as here, be illegally denied—sick leave protections, Lyft drivers and other service workers are at higher risk of spreading such illnesses because they regularly come into contact with the general public in the course of their work. Id. ¶ 22.  The health of Lyft drivers, consumers, and the general public thus requires immediate injunctive relief to reduce the rate at which this deadly disease spreads by ensuring Lyft drivers have access to workplace protections that will realistically allow them to comply with essential public health directives.

By contrast, Lyft is a massive international corporation, which recently received a $24 billion valuation in March of 2019. Id. ¶ 28.  If Lyft is enjoined from classifying its drivers as independent contractors and required to provide paid sick days, any financial harm, immediate or otherwise, pales in comparison to that shouldered by its drivers, its passengers, and the general public.  For instance, issuing an injunction even absent concerns regarding COVID-19, the Superior Court in San Diego found that the "balance of harms" resulting from Instacart's similar misclassification scheme favored its "Shoppers" and the public as a result of the harms inflicted by the misclassification scheme.  See Ruling on Mot. For Preliminary Injunction, Maplebear, Inc., Case No. 2019-48731 (Ex. 3 to Liss-Riordan Decl.).  Here, there is no question that any potential "harm" Lyft faces in being required to comply with employment standards in effect

_____

[8]      Indeed, studies have linked the dearth of paid sick leave policies in the United States with negative health outcomes during the 2009–10 H1N1 outbreak. Id. at ¶ 18.  The American Public Health Association estimates an additional 7 million people were infected and 1,500 deaths due to contagious employees who did not (or could not) stay home from work to recover. Id.

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE* APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION

since <u>Dynamex</u> was decided two years ago (and A.B. 5 went into effect in January) is drastically outweighed by the public health risk posed by Lyft's ongoing refusal to properly classify and provide paid sick time to its drivers.

Given the substantial likelihood of success Plaintiff has on the merits of his underlying misclassification claim (and thus resultant paid sick leave claims), Lyft is almost certainly legally required to comply with California's paid sick time law and therefore cannot point to costs due to reclassification (or a change in business model) as a harm that should be weighed in the preliminary injunction analysis.  See <u>Maplebear, Inc.</u>, Case No. 2019-48731, at *4 (Ex. 3 to Liss-Riordan Decl.) (discounting any costs to Instacart in the preliminary injunction analysis, as the company had two years to come into compliance with the law and cannot now "claim surprise").

Moreover, Lyft should not get to decide what level of compliance with workplace protections it deems sufficient to serve its employees and the public.  The legislature made a clear determination that paid sick time—in the manner it specified by statute—guarantees substantial benefits to workers and benefits public health.  2014 California Assembly Bill No. 1522, California 2013–2014 Regular Session, § 1(e).  Lyft's ongoing noncompliance with that law poses a substantially greater harm to its drivers and to the public than any harm it could face. The Court should thus grant an immediate emergency preliminary injunction to require Lyft's compliance with these laws.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should enjoin Lyft from misclassifying its drivers as independent contractors, thus entitling them to the protections of California wage laws, including paid sick leave.  Doing so immediately is essential to avoiding imminent harm to Lyft drivers, as well as the general public.

Dated: March 17, 2020

Respectfully submitted,

JOHN ROGERS, on behalf of himself and all others
similarly situated,

By his attorneys,

 /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, BBO# 640716
Anne Kramer, BBO# 697435
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:    (617) 994-5800
Facsimile:    (617) 994-5801
Emails: sliss@llrlaw.com; akramer@llrlaw.com

PLAINTIFF'S NOTICE OF AND MEMORANDUM IN SUPPORT OF HIS *EX PARTE*
APPLICATION FOR AN EMERGENCY PRELIMINARY INJUNCTION