UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ROGERS, et al.,<br><br>              Plaintiffs,<br><br>    v.<br><br>LYFT, INC.,<br><br>              Defendant. | Case No.  20-cv-01938-VC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION; REMANDING REQUEST FOR PUBLIC INJUNCTION**<br><br>Re: Dkt. Nos. 8, 19 |

In this case, three Lyft drivers have filed an emergency motion to require Lyft to reclassify all of its drivers in California from "independent contractor" to "employee" status, as required by California's new law governing worker classification. The plaintiffs' frustration with Lyft's steadfast refusal to comply with the new law is understandable. While the status of Lyft drivers was previously uncertain, it is now clear that drivers for companies like Lyft must be classified as employees.

But this lawsuit—which was filed hurriedly in an attempt to capitalize on the coronavirus pandemic—is riddled with defects. The fact that Lyft is ignoring an obvious legal obligation does not permit this Court to brush those defects aside. Nor, for that matter, does the current health crisis. The plaintiffs' motion for an emergency injunction reclassifying Lyft drivers is denied; Lyft's motion to compel the individual claims to arbitration is granted; Lyft's motion to strike the class allegations is granted; and the remaining claim for public injunctive relief is remanded to state court because this Court lacks jurisdiction to entertain it.

I

Although the plaintiffs' motion for emergency relief is dominated by technical legal

questions, it's worth taking a moment to put the matter in context. The coronavirus pandemic has caused millions of people to lose their jobs entirely. Millions more have seen their income streams decimated. And many of these people were already living hand to mouth. Their only recourse during the crisis will be to rely on emergency aid from the federal and state governments—aid like cash payments, unemployment benefits, emergency refundable tax credits, and sick pay.

In the midst of all this, a few Lyft drivers have rushed to court with a class action lawsuit seeking an emergency ruling that requires the company to reclassify its drivers from "independent contractor" to "employee" status. They are represented by a lawyer who has been filing similar suits against Lyft and other "gig economy" companies for years. What makes this an emergency, in their view, is that if Lyft is finally forced to reclassify its drivers, those drivers will potentially qualify for sick pay under California law.

At first glance, this case might seem to present the kind of situation that would justify an emergency motion. Sick leave policies, the plaintiffs correctly note, generally decrease the chances that people will go to work sick. And especially during this health crisis, the public interest favors more access to paid sick leave so that people will avoid going to work sick— especially when "going to work" means occupying close quarters in a car with other people. But the question whether Lyft drivers to qualify for California sick pay is less of an emergency than the plaintiffs suggest, for at least three reasons.

First, even if drivers were reclassified, the amount of sick pay involved would be small. *See* Cal. Labor Code § 246. Although a handful of drivers might qualify for three days' worth of sick pay per year (the amount at which employers can cap usage under California law), most Lyft drivers would not qualify for anything close to that. The record suggests that roughly 41 percent of the drivers haven't accrued enough hours of work to qualify for sick pay at all. And even for those who do qualify, a significant percentage would get four hours (that is, a half day) or less.

Second, if the Court ordered Lyft to reclassify its drivers immediately, it's possible that

the drivers would lose the opportunity to obtain emergency assistance totaling thousands of dollars from the federal government. Take, for example, sick leave. The Families First Coronavirus Response Act offers substantial sick pay to independent contractors sidelined by coronavirus. Pub. L. No. 116-127, § 7002, 134 Stat. 178, 212 (2020). The Act makes independent contractors eligible for up to ten days of paid sick leave in the form of refundable tax credits worth up to the lesser of $511 per day or their average daily income last year. § 7002(c)(1)(B), 134 Stat. at 212. But if Lyft drivers were employees, they might not qualify for these benefits. The Act funds sick pay for employees too, but it excludes people who work for companies with 500 or more employees. §§ 5102, 5110(2)(B)(i)(I)(aa), 134 Stat. at 195–96, 199. Lyft has well more than 500 drivers in California, so Lyft drivers (once classified as employees) might not be entitled to any type of sick pay under the new federal legislation. In addition, independent contractors can apply for a forgivable small business loan through the Paycheck Protection Program to cover up to 250 percent of their monthly income as a measure of "payroll costs." Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, § 1102(a)(2), 134 Stat. 281, 286–93 (2020). If Lyft drivers are immediately switched from independent contractor to employee status, they could lose their entitlement to this relief as well. Nor have the plaintiffs identified any additional benefits that employees of large employers receive under the emergency federal legislation that would offset these potential losses.

Third, even if the drivers wouldn't lose federal relief upon reclassification, it is indisputable that the small amounts of paid sick leave that would be available to some Lyft drivers under California Labor Code § 246 pale in comparison to the assistance workers will be able to get from the emergency legislation. *See, e.g.*, CARES Act § 2102(a)(3), (c), 134 Stat. at 313–15 (authorizing up to 39 weeks of unemployment assistance to independent contractors who cannot work or lost their job due to coronavirus but would not otherwise qualify for unemployment benefits); § 2104(b)(1)(B), (e)(2), 134 Stat. at 318–19 (augmenting unemployment benefits with $600 weekly payment through end of July); § 2201(a), 134 Stat. at 335 (establishing recovery rebate that, for example, pays out $1,200 to individual filers with

adjusted gross income under $75,000).

Against this backdrop, the plaintiffs insist that if they don't get their zero to three days of paid sick leave immediately, they are willing to put their passengers at risk. One of the plaintiffs, for example, insists that (unless he is reclassified) he will continue to give rides even if he develops coronavirus symptoms and would expose his passengers to the disease. At the same time, however, this driver says that business has fallen off sharply—to the point that he's been unable to get a fare for ten days. The upshot of his position, then, is as follows: He currently has little chance of making more than a few dollars a week by giving a ride or two, but if he has an opportunity to make those few dollars, he will not allow coronavirus symptoms to prevent him from doing so, even at risk of killing his passengers, even though that money will be a drop in the bucket compared to the assistance he could get from the emergency legislation, and even though obtaining that drop could shrink the overall size of the bucket.

While there's no justification for the tone-deafness of the position advanced by the plaintiffs and their lawyer as this crisis unfolds, perhaps there's an explanation for how they got there. As previously noted, the effort to require gig companies like Lyft to reclassify their workers has been underway for years. That effort has thus far been unsuccessful in the courts, a string of defeats and stalemates explained both by the widespread use of forced arbitration by these companies and by the previous lack of clarity in the law. *See Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078–81 (N.D. Cal. 2015). But California's new A.B. 5, which was passed in September 2019 and became operative January 1, 2020, makes clear that a company's workers must be classified as employees if the work they perform is not outside the usual course of the company's business. *See* Cal. Labor Code § 2750.3(a)(1); *see also Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903, 959–61 (2018). That test is obviously met here: Lyft drivers provide services that are squarely within the usual course of the company's business, and Lyft's argument to the contrary is frivolous. *See Cotter*, 60 F. Supp. 3d at 1078; *see also Namisak v. Uber Technologies, Inc.*, No. 17-cv-6124-RS, 2020 WL 1283484, at *4 (N.D. Cal. Mar. 13, 2020); *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1144 (N.D. Cal.

2015); *Yellow Cab Cooperative, Inc. v. Workers' Compensation Appeals Board*, 226

Cal. App. 3d 1288, 1293–94 (1991); *cf. People v. Maplebear, Inc.*, No. 2019-48731-CU-MC-

CTL (Cal. Super. Ct. Feb. 18, 2020). But rather than comply with a clear legal obligation,

companies like Lyft are thumbing their noses at the California Legislature, not to mention the

public officials who have primary responsibility for enforcing A.B. 5.[1]

 In short, there are no heroes in the story of this case. But there are several complicated

legal questions, to which this ruling now turns. The first question is whether the plaintiffs'

individual claims must be compelled to arbitration. The second is whether the plaintiffs have

waived their right to pursue claims on behalf of a class of Lyft drivers in California. The third

involves how the Court should handle the plaintiffs' request for a "public injunction."

II

 The plaintiffs resist Lyft's motion to compel arbitration on three grounds. First, they

assert that the Court should sidestep the motion to compel and proceed directly to their motion

for a preliminary injunction. Second, they invoke the exemption in the Federal Arbitration Act

(FAA) for transportation workers. *See* 9 U.S.C. § 1. And third, they contend that their request for

a public injunction is not arbitrable even if the FAA applies to the arbitration agreement.

A

 It would not be appropriate to plow ahead on the motion for a preliminary injunction

before ruling on Lyft's motion to compel. Injunctive relief and arbitration are not incompatible;

indeed, sometimes the parties' agreement to arbitrate can be vindicated only if a court issues

interim relief. *See PMS Distributing Co. v. Huber & Suhner, A.G.*, 863 F.2d 639, 641 (9th Cir.

1988). But the principle that authorizes a pre-arbitration preliminary injunction—preservation of

---

[1] On a policy level, reasonable minds can differ on whether gig workers for companies like Lyft should be treated like traditional employees. Indeed, this Court suggested in a prior ruling that perhaps a separate category, with a distinct set of protections, should be created for gig workers. *Cotter*, 60 F. Supp. 3d at 1082. But the California Legislature has now spoken on the policy question, and it has decided that workers like those who drive for Lyft must be classified as employees. The policy question having been decided, the legal question is easy—A.B. 5 contains no exception for wealthy corporations that disagree with the Legislature's policy judgment and would rather not spend money to effectuate that judgment.

the parties' arbitral rights—also limits the court's discretion in this regard. As the Ninth Circuit put it, "a district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process." *Toyo Tire Holdings of Americas Inc. v. Continental Tire North America, Inc.*, 609 F.3d 975, 981 (9th Cir. 2010).

The requested injunction is not ancillary to the arbitration process, nor would it maintain the status quo. Even putting aside the arbitration agreement, a mandatory injunction that "goes well beyond simply maintaining the status quo" by ordering a party to take affirmative action is "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (internal quotation marks omitted). And if the parties agreed that the arbitrator would get the first stab at the classification question, the issuance of the preliminary injunction would reclaim for the judiciary a matter assigned by the parties to arbitration. *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725–26 (9th Cir. 1999). The plaintiffs want now what an arbitrator might (or might not) provide later: an order compelling Lyft to reclassify all California drivers as employees. Nor is the analysis different because the plaintiffs invoke a provision of California's Unfair Competition Law that authorizes public injunctions, a state-law concept that aims to remedy the general public's injury from unfair competition. Cal. Bus. & Prof. Code § 17203; *see McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017). Arbitrators are capable of adjudicating requests for public injunctions, no less than requests for private injunctions. *See Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 828 (9th Cir. 2019); *see also Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013) (holding that the FAA preempts state law that prohibits arbitration of public injunctions). In short, court-ordered reclassification of Lyft drivers prior to arbitration would displace, rather than preserve, the arbitration process. Of course, whether to compel the claims to arbitration (and, more to the point, which claims to compel) is a separate question. But that question cannot be disregarded at the outset.

B

Proceeding to Lyft's motion to compel, the parties dispute whether the FAA applies to

the arbitration agreement. We have been told time and again that the FAA embodies a "liberal federal policy favoring arbitration agreements." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (internal quotation marks omitted). Yet we are reminded just as frequently that no legislation "pursues its purposes at all costs." *Hernández v. Mesa*, 140 S. Ct. 735, 741–42 (2020) (internal quotation marks omitted). And so it is that the FAA does not apply—at all—to whole industries of workers. In its very first provision, the FAA disclaims that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

The plaintiffs, as the parties resisting arbitration, bear the burden of proving that this exemption applies. *See Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1151 (9th Cir. 2008). They obviously aren't seamen or railroad employees, but they claim membership in some "other class of workers engaged in foreign or interstate commerce." The Supreme Court has narrowly interpreted this phrase as a residual clause covering only "transportation workers" who are "engaged in foreign or interstate commerce." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).[2]

The applicability of this exemption is for the Court to decide. As the Supreme Court confirmed last Term, "a court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019). *New Prime* also settled another aspect of the transportation worker exemption: Although section 1 employs the phrase "contracts of employment," that term includes "agreements that require independent contractors to perform work." *Id.* at 539. Lyft does not contest that the Terms of Service containing the arbitration agreement is a contract of employment under this definition, notwithstanding the parties' dispute over the proper classification of the drivers. So the only remaining question is whether the plaintiffs belong to "any . . . class of workers engaged

---

[2] Even if the FAA does not apply to an arbitration agreement, state law might still mandate arbitration of a dispute. *See Breazeale v. Victim Services, Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016). But Lyft hasn't argued here that the plaintiffs can be compelled to arbitrate under California law if they are exempt transportation workers.

in foreign or interstate commerce." 9 U.S.C. § 1.

Lyft first argues broadly that transportation workers can qualify for exemption from the FAA only if they transport goods (as opposed to people) in interstate commerce. Lyft relies on the Supreme Court's choice to underscore "Congress' demonstrated concern with transportation workers and their necessary role in the free flow of goods" when interpreting the statute. *Circuit City*, 532 U.S. at 121; *see also id.* at 112 (agreeing with the majority of circuits that had limited the exemption "to transportation workers, defined, for instance, as those workers 'actually engaged in the movement of goods in interstate commerce'") (internal quotation marks omitted); *Cole v. Burns International Security Services*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) (collecting circuits with similar definitions).

Several district courts have relied on these statements to conclude that section 1 of the FAA exempts only those who transport physical goods. *See, e.g.*, *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 483–84 (S.D.N.Y. 2008). But the Supreme Court and those circuit courts, while mentioning only goods, did not expressly consider whether section 1 encompasses passenger transportation as well. Meanwhile, the Third Circuit recently concluded that the exemption can apply to workers who transport passengers. *Singh v. Uber Technologies Inc.*, 939 F.3d 210, 226 (3d Cir. 2019). And the Ninth Circuit, before *Circuit City*, described the transportation worker exemption more broadly as applying to "the contracts of employees who actually transport people or goods in interstate commerce." *Craft v. Campbell Soup Co.*, 177 F.3d 1083, 1085 (9th Cir. 1999) (per curiam). With only non-binding authority and dicta on either side, the parties will have to sink or swim based on the persuasiveness of their arguments.

The traditional tools of statutory interpretation all point in the same direction: Section 1 is not limited to classes of workers who transport goods in interstate commerce. As an initial matter, the goods-passengers distinction is nowhere to be found in the statutory text, which refers to "foreign or interstate commerce." The term "commerce" is "not normally limited to the transportation of only physical goods." *Singh*, 939 F.3d at 229 (Porter, J., concurring in part and concurring in the judgment). To the contrary, "it is settled beyond question that the transportation

of persons is 'commerce'" for constitutional purposes, an understanding that prevailed well before the enactment of the FAA. *Edwards v. California*, 314 U.S. 160, 172 (1941); *see Head Money Cases*, 112 U.S. 580, 591–93 (1884). The constitutional meaning is particularly relevant here because the FAA tracks the Commerce Clause by defining "commerce" to include "commerce among the several States or with foreign nations." 9 U.S.C. § 1; *see* U.S. Const. art. I, § 8, cl. 3. Nor can the goods-passengers distinction be justified by the ordinary meaning of the term "commerce" in 1925. *See New Prime*, 139 S. Ct. at 542. Contemporary sources often describe the transportation of goods and passengers in the same breath as commerce. *See, e.g.*, *Norfolk & Western Railroad Co. v. Pennsylvania*, 136 U.S. 114, 119 (1890); *United Dredging Co. v. City of Los Angeles*, 10 F.2d 239, 239 (S.D. Cal. 1926). And the longstanding modern definition of "in commerce" continues to be "persons or activities within the flow of interstate commerce." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974). Lyft's narrow interpretation still comes up empty "by reference to the enumerated categories of workers which are recited just before" the residual clause. *Circuit City*, 532 U.S. at 115. The ships and trains that transport passengers are staffed by seamen and railroad workers, just like the ones that transport goods. *See Singh*, 939 F.3d at 221–22. In fact, the Supreme Court's lone example of a class of workers engaged in interstate commerce—"air carriers and their employees"—is associated more with the transportation of passengers than goods. *Circuit City*, 532 U.S. at 121. All that remains is the FAA's pro-arbitration purpose and the statement in *Circuit City* that the exemption in section 1 should be given a "narrow construction." *Id.* at 118. But these general mantras can't will a statute where text, history, and precedent won't take it. *New Prime*, 139 S. Ct. at 543.

As a fallback position, Lyft argues that even if workers who transport passengers can qualify for the exemption, the plaintiffs nonetheless don't belong to a class of workers "engaged in foreign or interstate commerce." This argument has a more solid foundation in the statute—specifically, the words "engaged in." Consider the FAA's reference to contracts "involving" commerce. 9 U.S.C. § 2. That phrasing "signals an intent to exercise Congress' commerce power

to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995). By contrast, the phrase contained in the exemption for seamen, railroad employees and transportation workers— "engaged in foreign or interstate commerce"—captures a narrower set of activities. *See Circuit City*, 532 U.S. at 118. This term of art evinces "[n]o similar concern for the impact of intrastate conduct on interstate commerce." *United States v. American Building Maintenance Industries*, 422 U.S. 271, 278 (1975). Rather, the term describes "only persons or activities within the flow of interstate commerce," meaning "the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil*, 419 U.S. at 195.

The narrower meaning of "engaged in foreign or interstate commerce" dictates that only those classes of workers that transport goods or passengers across state lines (or international boundaries) can qualify for the exemption. For example, in *United States v. Wright*, 625 F.3d 583 (9th Cir. 2010), a federal statute (since amended) criminalized the act of transporting child pornography "in interstate or foreign commerce." *Id.* at 590. The Ninth Circuit held that the statute required "the material itself to cross state lines," an interpretation that rested in part on *Circuit City*. *Id.* at 592–94. The rationale of *Wright* is equally applicable here: Section 1, which likewise addresses transportation in commerce, exempts only classes of workers engaged in transporting goods or people across state lines.

Lyft leads off with evidence relating to whether the plaintiffs in this case ever crossed state lines while driving for Lyft. Admittedly, some courts have placed substantial weight on the fact that the plaintiffs themselves performed only intrastate trips. *See Magana v. DoorDash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal. 2018). Yet the question posed by the exemption is "not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce." *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 405 (6th Cir. 1988). The plaintiffs' personal exploits are relevant only to the extent they indicate the activities performed by the overall class. If a class of workers (say, truckers) transports goods or people between states, a trucker who only

occasionally drives across state lines is still exempt from the FAA. *See International Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012). Indeed, that remains true even if the trucker has *never* left his home state. *See Bacashihua*, 859 F.2d at 405. By the same token, however, the fact that some workers cross state lines in the course of their duties does not mean that the class of workers as a whole is engaged in interstate commerce. Take the Eleventh Circuit's example of "a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town." *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005). Notwithstanding the fact that pizzas are crossing state lines, no pizza delivery person belongs to a "class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

Applying those principles, Lyft drivers, as a class, are not engaged in interstate commerce. Their work predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself. Although we can safely assume that some drivers (especially those who live near state borders) regularly transport passengers across state lines, the company is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers. Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers. *See Hill*, 398 F.3d at 1290.

Nor does the fact that Lyft drivers frequently pick up and drop off people at airports and train stations mean that they are, as a class, "engaged in" interstate commerce. It would be one thing if Lyft's focus were the service of transporting people to and from airports. For example, people who drive for an airport shuttle service might constitute a class of transportation workers engaged in interstate commerce—the interstate character of that nominally intrastate activity could be demonstrated by analogy to the transportation of goods. *See, e.g.*, *Baltimore & Ohio Southwestern Railroad Co. v. Burch*, 263 U.S. 540, 544 (1924) (discussing "the loading or unloading of an interstate shipment"); *Philadelphia & Reading Railroad Co. v. Hancock*, 253 U.S. 284, 286 (1920) (first intrastate leg of interstate coal route); *Rittmann v. Amazon.com, Inc.*,

383 F. Supp. 3d 1196, 1201 (W.D. Wash. 2019) (last intrastate leg of interstate package

delivery). But Lyft is, in essence, a technologically advanced taxicab company, allowing people

to "hail" rides from its drivers from pretty much anywhere to pretty much anywhere.

Speaking of taxicabs, the Supreme Court's ruling in *United States v. Yellow Cab Co.*, 332

U.S. 218 (1947), helps show why Lyft drivers are not, at least as a class, "engaged in" interstate

commerce. That case involved allegations by the federal government that cab companies were

engaged in various antitrust conspiracies to divide up the market for rides. One such conspiracy

was an agreement between cab companies not to compete with one another for contracts with

railroads to transport passengers between train stations in Chicago. As the Supreme Court

explained, this sort of arrangement *did* involve the stream of interstate commerce, thereby

implicating the federal antitrust laws, because the arrangement was directed at rail journeys and

involved contracts with the railroads regarding portions those journeys:

> The transportation of such passengers and their luggage between
> stations in Chicago is clearly part of the stream of interstate
> commerce. When persons or goods move from a point of origin in
> one state to a point of destination in another, the fact that a part of
> that journey consists of transportation by an independent agency
> solely within the boundaries of one state does not make that portion
> of the trip any less interstate in character. . . . Here there is an alleged
> conspiracy to bring nearly all the Chicago taxicab companies under
> common control and to eliminate competition among them relative
> to contracts for supplying transportation for this transfer in the midst
> of interstate journeys.

*Id.* at 228–29. In contrast, another alleged antitrust violation was a conspiracy to limit the

number of taxicab companies that could operate in Chicago overall. The federal government

contended that this conspiracy also involved the stream of interstate commerce because taxis

sometimes took people to and from rail stations or hotels. But this was not enough:

> None of [the taxicab companies] serves only railroad passengers, all
> of them being required to serve "every person" within the limits of
> Chicago. They have no contractual or other arrangement with the
> interstate railroads. Nor are their fares paid or collected as part of
> the railroad fares. In short, their relationship to interstate transit is
> only casual and incidental. . . . [W]hen local taxicabs merely convey
> interstate train passengers between their homes and the railroad
> station in the normal course of their independent local service, that
> service is not an integral part of interstate transportation.

*Id.* at 231, 233. It's difficult to see how a different analysis could apply to these modern-day taxi drivers. Like the drivers in *Yellow Cab*, Lyft drivers' "relationship to interstate transit is only casual and incidental." *Id.* at 231. The drivers thus lack the requisite "practical, economic continuity" with interstate air or rail transportation. *Gulf Oil*, 419 U.S. at 195; *see Circuit City*, 532 U.S. at 117–18 (explaining that the term "engaged in commerce" bears a consistent meaning across statutory enactments).[3]

C

Because the plaintiffs are not transportation workers, the parties' arbitration agreement is subject to the FAA. The Terms of Service contains a broadly worded delegation provision that allocates most threshold issues to the arbitrator. Section 17(a) of the parties' agreement states that "[a]ll disputes concerning the arbitrability of a Claim (including disputes about the scope, applicability, enforceability, revocability or validity of the Arbitration Agreement) shall be decided by the arbitrator, except as expressly provided below." Dkt. No. 19-2. The sole pertinent exception to the delegation provision is found in the next subsection. Section 17(b) waives the plaintiffs' right to pursue class, collective, or representative claims and further provides that the "arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's claims." That subsection also directs that "disputes regarding the scope, applicability, enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator." In addition, upon a "final judicial determination that the Class Action Waiver is unenforceable with respect to any Claim or any particular

---

[3] Some courts weigh eight non-exclusive factors to assess whether workers "with duties only tangentially related to movement of goods" nonetheless "are so closely related to interstate commerce" that they qualify as transportation workers. *Lenz v. Yellow Transportation Inc.*, 431 F.3d 348, 351–52 (8th Cir. 2005). In *Lenz*, for example, the Eighth Circuit concluded that a customer service representative for a trucking company is not exempt from the FAA. *Id.* at 352–53. The plaintiffs urge the application of these factors here. Even assuming that the *Lenz* factors are relevant in this context, *but see Kowalewski*, 590 F. Supp. 2d at 482 n.3, there is no need for recourse to an indeterminate balancing test in light of the Supreme Court's analysis in *Yellow Cab*.

13

remedy for a Claim (such as a request for public injunctive relief), then that Claim or particular remedy (and only that Claim or particular remedy) shall be severed from any remaining claims and/or remedies and may be brought in a civil court of competent jurisdiction."

There are three important conclusions to draw from these densely worded provisions. First, section 17(a) clearly and unmistakably delegates threshold questions of arbitrability to the arbitrator as a general matter. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). Second, section 17(b) withdraws (or at the very least muddies) a portion of that delegation with respect to the enforceability of the waiver of non-individualized relief, including class actions and public injunctions. And third, section 17(b) provides that if the waiver is unenforceable as to a particular claim or remedy, that claim or remedy—and only that claim or remedy—is not arbitrable.

Under this arbitration agreement's division of labor, the arbitrator handles everything related to individualized relief. The court's role is deciding the enforceability of the waiver of non-individualized relief and then retaining whatever (if anything) withstands the across-the-board waiver. Supreme Court precedent makes clear that the class action waiver is enforceable. *Epic Systems*, 138 S. Ct. at 1621; *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). But the request for a public injunction is a different story. Just last year, the Ninth Circuit held that the FAA does not preempt California's rule that waivers of the right to request a public injunction are contrary to public policy and invalid under state law. *Blair*, 929 F.3d at 830–31; *see McGill*, 2 Cal. 5th at 961 (citing Cal. Civ. Code § 3513). The arbitration agreement's prohibition on public injunctions is therefore unenforceable. *See* 9 U.S.C. § 2.

Per the terms of the arbitration agreement, the request for a public injunction is "severed from any remaining claims and/or remedies and may be brought in a civil court of competent jurisdiction." Terms of Service § 17(b). This type of claim-splitting and remedy-splitting may be inefficient and unusual, but it's permitted so long as the parties have agreed to that course of action. *See Blair*, 928 F.3d at 831. After all, arbitration is "strictly a matter of consent"—not necessarily a matter of common sense. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019).

In sum, Lyft's motion to compel is granted as to the plaintiffs' claims for individualized relief. Although Lyft requested a stay in the event arbitration is compelled, *see* 9 U.S.C. § 3, the Court exercises its discretion to dismiss the arbitrable claims without prejudice, *see Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073–74 (9th Cir. 2014). The class allegations are stricken because the plaintiffs waived the right to represent a class in any forum. And Lyft's motion to compel the request for a public injunction to arbitration is denied, because although the plaintiffs purported to waive the right to seek such relief, this waiver is invalid, and the parties agreed that in the event the waiver is invalid, the claim is for a court (not an arbitrator) to decide.

III

The plaintiffs thus have one live claim for relief in this Court: their request for a public injunction based on Lyft's denial of paid sick leave. The question is whether they have standing in federal court to seek such relief. The plaintiffs clearly would have standing to assert claims for paid sick leave premised on their own injuries, had they not agreed to arbitrate their entitlement to individualized relief. And the plaintiffs clearly would have standing to assert claims for sick leave on behalf of a class of Lyft drivers, had they not waived the right to seek class relief. Yet the plaintiffs "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000). Given the decision on Lyft's motion to compel arbitration and the contract's remedy-splitting provision, the only remedy that the plaintiffs can seek in this lawsuit is a public injunction.

The public injunction is a creature of California law that "has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public." *McGill*, 2 Cal. 5th at 951. Unlike a class action, the plaintiff sues in an individual capacity, not a representative capacity. *See id.* at 959–60. Yet California law does not appear to require a plaintiff seeking a public injunction to demonstrate any type of likely future injury, let alone a "concrete, particularized, and actual or imminent" injury. *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013). The only requirement appears to be that the plaintiff show the past

injury of "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. And the public injunction need not—indeed, is not supposed to—redress a plaintiff-specific injury. The public injunction benefits the plaintiff, "if at all, only by virtue of being a member of the public." *Broughton v. Cigna Healthplans of California*, 21 Cal. 4th 1066, 1080 n.5 (1999). Put differently, "public injunctions benefit 'the public directly by the elimination of deceptive practices,' but do not otherwise benefit the plaintiff, who 'has already been injured, allegedly, by such practices and is aware of them.'" *Blair*, 928 F.3d at 824 (brackets omitted) (quoting *McGill*, 2 Cal. 5th at 955).

In light of this case's unusual posture, where the plaintiffs agreed to arbitrate the availability of remedies specific to their injuries and waived the right to pursue any type of class remedy, the question presented is whether the plaintiffs can invoke federal-court jurisdiction to adjudicate only a request for a public injunction. The answer is no. As explained above, the purpose of a public injunction "is not to resolve a private dispute but to remedy a public wrong." *Broughton*, 21 Cal. 4th at 1080. But the judicial power under Article III "exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Thus, even if state law authorizes a plaintiff to seek a public injunction on behalf of the general public, that authorization, standing alone, does not confer standing in federal court. *See Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013); *see also McGovern v. U.S. Bank N.A.*, 362 F. Supp. 3d 850, 858 (S.D. Cal. 2019). Plaintiffs may sometimes request public injunctive relief in the course of combating an actual and imminent threat of future harm to themselves. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018). But they may not invoke state law to use the federal courts merely to pursue a generalized public grievance. "No matter its reasons, the fact that a State thinks a private party should have standing to seek relief for a generalized grievance cannot override" the baseline requirements of Article III. *Hollingsworth*, 570 U.S. at

715; *cf. Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).[4]

Analogously, the Supreme Court has held that a plaintiff cannot continue to seek broad injunctive relief against a policy after settling the claims related to his threatened injury. *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009). That holding would seem to extend to a situation in which the party agreed to arbitrate claims based on his own injuries. In both instances, the plaintiffs agreed not to litigate claims for individualized relief but have pressed on with a challenge to the overall policy. *See also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 73–74 (2013) (no personal stake in outcome of collective action once individual claim is moot). The fact that one plaintiff settled his claim and the other plaintiff must arbitrate his claim is immaterial to whether a federal court can adjudicate a standalone "abstract" request for an injunction "apart from any concrete application" of the challenged policy "that threatens imminent harm" to the plaintiffs. *Summers*, 555 U.S. at 494.

Of course, state courts are free to experiment with remedies that federal courts may not entertain. *City of Los Angeles v. Lyons*, 461 U.S. 95, 113 (1983). So depending on the breadth of state standing rules, the plaintiffs' lack of standing in federal court does not prevent California courts from hearing requests for public injunctions. *See* Zachary D. Clopton, *Procedural Retrenchment and the States*, 106 Cal. L. Rev. 411, 436–38 (2018). This case was originally filed in state court but removed by Lyft to federal court under the Class Action Fairness Act, a removal made possible only by the plaintiffs' decision to file the lawsuit as a proposed class action despite their waiver of the right to do so. Under these circumstances, with the only live claim seeking a single remedy that the plaintiffs lack standing to pursue in federal court, it is appropriate to remand the matter to state court. *See Davidson*, 889 F.3d at 970 n.6; *Polo v. Innoventions International, LLC*, 883 F.3d 1193, 1196–97 (9th Cir. 2016); *see also Machlan v.*

---

[4] A request for a public injunction involves a very different standing analysis from a lawsuit brought by a private citizen under the federal False Claims Act or California's Private Attorneys General Act. There, the government has effectively assigned its claim to the private citizen pursuant to a traditionally recognized agency relationship, which creates a "case" or "controversy" for purposes of Article III. *See Hollingsworth*, 570 U.S. at 710–14; *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773–74 (2000).

*Procter & Gamble Co.*, 77 F. Supp. 3d 954, 961 (N.D. Cal. 2015).

Lyft argues that the plaintiffs' claim is obviously for private injunctive relief, not public injunctive relief. If that were true, Ninth Circuit precedent suggests that the Court could simply dismiss the remaining claim on the ground that remand would be futile. *See Bell v. Kellogg*, 922 F.2d 1418, 1425 (9th Cir. 1991). But the outcome in state court on remand is not foreordained, even assuming that review for futility remains appropriate. *See Polo*, 883 F.3d at 1198. To be sure, the plaintiffs' decision to label their claim as one for a "public injunction" seems dubious because the proposed remedy runs directly to the plaintiffs and similarly situated drivers, with the public benefiting only collaterally from the provision of paid sick leave. *See Clifford v. Quest Software Inc.*, 38 Cal. App. 5th 745, 753 (2019). Indeed, the plaintiffs appear to conflate the magnitude of the public interest in a private injunction with the manner in which a public injunction benefits the general population in equal shares (for example, by enjoining false advertising or deceptive labeling that could trick any member of the public). That being said, California case law has not drawn the brightest of lines between a "private injunction" and a "public injunction," so remand would not be an exercise in futility. The state court will consider the matter in the first instance.

*     *     *

Lyft's motion to compel arbitration is granted as to the plaintiffs' claims for individualized relief. The class allegations are stricken. The remaining claim for a public injunction is remanded to San Francisco Superior Court.

**IT IS SO ORDERED.**

Dated: April 7, 2020

VINCE CHHABRIA
United States District Judge